**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
MIAMI DIVISION
CASE NO.:

DUAL DIAGNOSIS TREATMENT CENTER,
INC. d/b/a SOVEREIGN HEALTH OF
CALIFORNIA; SOVEREIGN HEALTH OF
FLORIDA, INC.; SOVEREIGN HEALTH OF
PHOENIX, INC.; SHREYA HEALTH OF
CALIFORNIA, INC.; SHREYA HEALTH OF
ARIZONA, INC.; MEDICAL CONCIERGE,
INC. d/b/a MEDLINK; SATYA HEALTH OF
CALIFORNIA, INC.; and VEDANTA
LABORATORIES, INC.;

    Plaintiffs,

vs.

BLUE CROSS AND BLUE SHIELD OF
FLORIDA, INC.,

    Defendants.

_____/

**COMPLAINT FOR RECOVERY OF**
**BENEFITS OWED AND FOR BREACH OF CONTRACT**

   Plaintiffs Dual Diagnosis Treatment Center, Inc. d/b/a Sovereign Health of California ("Dual Diagnosis"); Sovereign Health of Florida, Inc. ("Sovereign Florida"); Sovereign Health of Arizona, Inc. ("Sovereign Arizona"); Shreya Health of California ("Shreya California") Medical Concierge, Inc. d/b/a Medlink ("Medlink"); Satya Health of Florida, Inc. ("Satya"); and Vedanta Laboratories, Inc. ("Vedanta") (collectively referred to as the "Plaintiffs") for their complaint against Defendant Blue Cross and Blue Shield of Florida, Inc. ("BCBS-FL") state:

**INTRODUCTION**

   1.  The Blue Cross Blue Shield Association, (the "Association") and its affiliated insurance companies, including but not limited to BCBS-FL, provide health insurance coverage to

about one in three Americans. According to Blue Cross's own press, ninety-one percent of health care providers have contracted with Blue Cross entities to offer discounted services to Blue Cross members, and ninety-seven percent of the claims that Blue Cross pays are to such "in-network" providers.

2.      The several plaintiffs in this action treat individuals suffering from drug addiction and/or mental health problems. As a matter of practice, Plaintiffs obtain assignments from their patients.

3.      Plaintiffs bring this suit to enforce their valid assignments of benefits and to vindicate their rights under the Employee Retirement Income Security Act of 1974 ("ERISA") and state law, as applicable.

4.      In a nutshell, BCBS-FL, as a Blue Cross affiliated company, does everything it can to undermine Plaintiffs' ability to operate as independent, out-of-network ("OON") providers. Specifically, BCBS-FL engages in the following improper conduct, all of which is prohibited by ERISA:

      a.   misleads Plaintiffs about whether claims are assignable under the governing plan documents, and then later, with no explanation, refuses to pay Plaintiffs and instead pays some unknown amount to the recovering addicts themselves,

      b.   refuses to honor assignments even when the underlying plan document permits them, and

      c.   never plainly tells its beneficiaries that the assignments they choose to give will not be honored.

5.     This scheme of deception and confusion leaves OON providers like the Plaintiffs misled, confused, and often holding the bag for services rendered in good faith to suffering patients —all of which unfairly increases the cost of running their businesses.

6.     Defendant does not even attempt to hide this conduct; as one Blue Cross company described it: "payments for services rendered by providers who do not contract with [Blue Cross] are sent directly to our customers. Thus, out-of-network providers face the inconvenience of attempting to collect payment from the customer and the accompanying possibility of incurring bad debts." *See Blue Perspective: BCBSOK Position on Legislation and Regulatory Issues*, Blue Cross Blue Shield Oklahoma, www.bcbsok.com/grassroots/pdf/blueperspective_aob27-103003.pdf (last visited October 27, 2020).

7.     Cutting providers out of the process also saves Defendant money by leaving to unsophisticated patients (i.e., recovering addicts) the responsibility of ensuring that the insurance plans have fully paid the patients' benefit entitlements.

8.     By this action, Plaintiffs are seeking to recover the amounts owed by BCBS-FL for services provide to the various patients referenced in this Complaint and to hold BCBS-FL accountable for its violations of ERISA and State law.

## THE PARTIES

A.     **Plaintiffs:**

9.     Plaintiffs are entities that provided in- and out-patient substance abuse and/or mental health treatment to various patients in California, Arizona, Florida, and other locations across the United States.

10.     Dual Diagnosis Treatment Center, Inc. d/b/a Sovereign Health of California ("Dual Diagnosis") is a corporation duly organized and existing under the laws of California. At all

relevant times, Dual Diagnosis did business as "Sovereign Health of California," and on occasion under other names in accordance with its governing certifications and licensures. At all relevant times, Dual Diagnosis was certified to operate and maintain behavioral health treatment facilities in San Clemente, Culver City and Palm Springs California, among other locations.

11.     Sovereign Health of Florida ("Sovereign Florida") is a corporation duly organized and existing under the law of Delaware, doing business as "Sovereign Health of Florida."  At all relevant times, Sovereign Florida is and was licensed to operate and maintain a behavioral health residential facility in Pompano Beach, Florida and provided comprehensive treatment programs for mental health, addiction and other behavioral health disorders.

12.     Sovereign Health of Phoenix ("Sovereign Phoenix") is a corporation duly organized and existing under the law of Delaware.  At all relevant times, Sovereign Phoenix is and was licensed to operate and maintain a behavioral health residential facility in Arizona and provided comprehensive treatment programs for mental health, addiction and other behavioral health disorders

13.     Shreya Health of California, Inc. ("Shreya") is a corporation duly organized and existing under the laws of California.  At all relevant times, Shreya operated as a facility that provided 24 hour therapeutically planned living and rehabilitative environment for treatment of individuals with behavioral and other disorders.  Shreya operated a treatment facility in San Clemente, California, among other locations. Shreya provided services to several of the patients at issue in this litigation.

14.     Shreya Health of Arizona, Inc. ("Shreya Arizona") is a corporation duly organized and existing under the laws of Arizona and during the relevant times, operated a substance abuse rehabilitation facility located in Chandler, Arizona.  At all relevant times, Shreya operated a

rehabilitative facility for treatment of individuals with behavioral and other disorders.  Shreya operated a treatment facility in Chandler Arizona, among other locations. Shreya provided services to several of the patients at issue in this litigation

15.     Medical Concierge, Inc. ("Medlink") is a corporation duly organized and existing under the laws of California, doing business as "Medlink." Medlink is licensed to operate and maintain an adult residential facility ("ARF") for ambulatory mentally ill adults.  Medlink provided services to several of the patients at issue in this litigation.

16.     Satya Health of California, Inc. ("Satya") is a corporation duly organized and existing under the laws of California. At all relevant times, Satya did business as "Sovereign by the Sea II," and on occasion under other names in accordance with its governing certifications and licensures. At all relevant times, Satya was licensed to operate and maintain behavioral health treatment facilities in San Clemente, Culver City, and Palm Springs, California, among other locations. Satya provided services to several of the patients at issue in this litigation.

17.     Vedanta Laboratories, Inc. ("Vedanta") is a corporation that was duly organized under the laws of the Delaware.  At all relevant times, Vedanta provides toxicology testing and quality assurance programs.  Vedanta serves clinicians and healthcare facilities. Vedanta provided services to several of the patients at issue in this litigation.

**B.     Former Patients:**

18.     This lawsuit involves behavioral health treatment services rendered by Plaintiffs to many individuals ("Former Patients") who Plaintiffs are informed and believe, at all relevant times, possessed health insurance covering some or all of the services that Plaintiffs provided.

19.     To protect their personal health information, the Former Patients are identified by their initials.  The Former Patients who had health insurance provided by an employer-sponsored

plan, covered by ERISA include the following: Ga.Ro., Ha.La., Je.Lo., and the following Former Patients have health insurance provided by an employer sponsored plan that is not covered by ERISA: An.Wi., Ap.Br., Co.Cl., Da.Cu., Kr.Ja., Li.Bu., Ni.Ca., No.Bl., Ri.Di., St.Li, Xi.Ma.[1]

**C.    Defendants:**

20.    Based upon documents obtained by Plaintiffs to date, Plaintiffs are informed and believe that the health insurance of each of the Former Patients listed in paragraph 20 above was obtained through what ERISA defines as an "employee benefit plan." 29 U.S.C. § 1002(3).

21.    Horizon Blue Cross Blue Shield of Florida ("BCBS-FL") has been providing health insurance products and services to Florida families, including the Former Patients at issue in this action.

22.    The BCBS-FL website boasts that "for more than 75 years, Florida has been our one and only home. Helping you an dour communities be as healthy as they can be is our mission and we will never stop finding new ways to achieve it."  Unfortunately, in this instance, BCBS-FL has not lived up to these expectations.

## JURISDICTION AND VENUE:

23.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. 1331, 29 U.S.C. 1132(e)(1) and 28 U.S.C. 1332(a).  Several of the Former Patients are seeking relief under ERISA for benefits owed and for the balance of the Former Patients, pursuant to 28 U.S.C. 1332 the parties to the complaint are of diverse citizenship and Plaintiffs seek in excess of $75,000 in damages.

---

[1] Defendant will be provided specific information as to each Former Patient, so that it can identify the patient and appropriate provide the administrative record in this action.

24.     Venue is proper in this district as pursuant to 28 U.S.C. 1132(e)(2) because much of the conduct that is the subject matter of this lawsuit occurred within this District, including the providing of insurance coverage under the covered plans, and the Defendant conducts business within the District either directly or through wholly owned and controlled subsidiaries.

## RELEVANT FACTS:

**A.     Plaintiffs Provide Gold Standard Treatment Services.**

25.     Plaintiffs are leading providers of comprehensive addiction and mental health treatment programs and other services to individuals in various locations across the United States.

26.     It is widely accepted that the services rendered by Plaintiffs and similar providers are extremely important. For example, according to the National Institute on Drug Abuse, every $1 spent on substance abuse treatment saves $4.87 in health care costs and $7.00 in crime costs. See Nat'l Inst. on Drug Abuse, Principles of Drug Addiction Treatment: A Research-Based Guide (3d ed. 1999).

27.     Plaintiff's approach to addiction and other mental health treatment was consistent with best practices in the industry. Its proven track record also earned Plaintiffs accolades from trade and government groups. Dual Diagnosis, for example, received the Gold Seal of Approval from the Joint Commission, an independent not-for-profit organization that is the nation's oldest and largest standards-setting and accrediting body in health care. And the California Board of Behavioral Health Sciences, the California Association for Alcohol/Drug Educators, and the National Association for Alcoholism and Drug Abuse Counsels approved Plaintiffs' entities to provide continuing education to licensed professionals.

**B.     Plaintiffs Investigate Prospective Patients' Health Insurance Coverage.**

28.    Plaintiffs, who are for-profit enterprises, allow prospective patients to pay for their services out-of-pocket or with health insurance. Unfortunately, many individuals in need of treatment cannot afford to pay for Plaintiffs' services up front. Plaintiffs are only able to treat those individuals who have health insurance covering some or all of their services.

29.    Before agreeing to treat any patient, Plaintiffs take steps to ensure that they will be compensated for their services.

30.    When a prospective patient seeks to pay with his or her health insurance, Plaintiffs investigate whether and to what extent the patient's insurance policy covers their various levels of service.

31.    When each Former Patient first sought treatment, as a matter of intended general practice described below, Plaintiffs or their agents verified that he or she was insured and ascertained the scope of his or her coverage through various procedures.

32.    Plaintiffs or its agents first secured the Former Patient's consent to contact his or her health insurance company, along with the identifying information necessary for Plaintiffs to interact with the insurer.

33.    Plaintiffs or their agents also asked for the dedicated phone number of healthcare providers associated with the Former Patient's insurance policy ("Provider Hotline"). Plaintiffs are informed and believe that each Former Patient authorized Plaintiffs to contact the Provider Hotline of a Blue Cross Defendant. Plaintiffs or their agents generally, but not always, recorded this information in the top box of a comprehensive document entitled "Insurance Verification Form."

34.    Plaintiffs or their agents called the Provider Hotline listed on the Insurance Verification Form on each Former Patient's behalf. When it reached a BCBS-FL representative,

Plaintiffs or their agents relayed the Former Patient's identifying information and requested details about his or her coverage.

35.     Plaintiffs or their agents generally recorded the information learned from the Blue Cross Defendant on the bottom of the Insurance Verification Form.

36.     To attempt to complete Plaintiffs' Insurance Verification Form, Plaintiffs or their agents generally inquired exhaustively into the characteristics of the Former Patient's health insurance coverage, including with respect to:

a.   The general characteristics of the health insurance policy (including fields for effective date and renewal date, the type of plan, and whether it covers preexisting conditions, among other things);

b.   The existence and scope of any substance abuse or mental health coverage (including fields regarding deductible for in-network and out-of- network services and maximum out-of-pocket payments for in-network and out- of-network services, among other things);

c.   Any precertification requirements (including fields indicating whether precertification required for inpatient treatment, residential treatment, partial hospitalization, intensive outpatient treatment, and/or outpatient treatment by in-network and out-of-network providers); and

d.   Copayments for each type of treatment and any limits on the length of treatment.

37.     Plaintiffs or their agents generally also investigated the logistics of securing authorization and payment for Plaintiffs' services, including:

9

a.  How to comply with precertification requirements (including fields for pre-certification company and telephone number);

b.  The name of the insurance company and the entity to which benefit claims should be submitted (including fields for insurance company and claims address); and

c.  Whether the Former Patient's health insurance benefits were assignable. The answer to this question was supposed to be recorded by circling "Yes" or "No" (or "Y" or "N") next to the word "assignable" on the Insurance Verification Form.

38.    After the insurance verification process, Plaintiffs then contacted each Former Patient to discuss his or her insurance policy and to make appropriate arrangements for treatment.

39.    During the verification of insurance benefits, Plaintiffs also confirm the available coverage under the various plans.

40.    The verification process was performed for the benefits provided to each of the patients at issue in this action and the amounts owed, per the plan verification ranged from 50-80% of the billed charges depending on the services provided and the particular plan itself.

41.    At no point in time did Horizon or any of its representatives inform Plaintiffs that they were denying or underpaying the various claims at issue in this litigation based on the medical necessity criteria or any other issue.  Rather, Horizon simply unjustifiably refused to pay the full claim, paid pennies on the dollar for various claims, and/or made improper payments to patients as opposed to Plaintiffs directly.

42.    Further, at no time has there been any claim made by Horizon that the necessary services for each of the patients was not covered under the policies/plans issued.  Rather, payments

were simply paid incorrectly, not paid at all, or significantly underpaid contrary to the requirements of the Former Patients plan documents.

**C.  Each Former Patient Had "Preferred Provider Organization" Coverage for Substance Abuse and Mental Health Treatment Services.**

43.     Plaintiffs only wish to provide services that prospective patients can afford. As such, as a matter of course Plaintiffs investigate whether the treatment needed by a patient (including the Former Patients) was covered by insurance.

44.     When Plaintiffs or their agents called the Blue Cross Defendants' Provider Hotlines, they learned that each Former Patient's health insurance policy had at least the following key features: (1) coverage for substance abuse/mental health treatment offered by Plaintiffs, and (2) preferred provider organization ("PPO") coverage.

45.     A PPO plan covers medical expenses incurred when the insured visits either an "in-network" provider (i.e., a provider who has a contractual relationship with the insurance company) or an "out-of-network" provider (i.e., one who does not have a contractual relationship with the insurance company).

46.     PPO coverage tends to be significantly more expensive than health maintenance organization ("HMO") coverage because it gives insureds the option to visit the providers of their choice. Many insureds are nevertheless willing to pay a premium for PPO coverage to gain access to a bigger and better pool of providers.

47.     No law required the plans to offer PPO coverage instead of HMO coverage. Each Plan chose to offer the more robust and expensive insurance to their employees, and each Former Patient or subscriber enrolled in and paid for that premium level of coverage.

11

48.     Plaintiffs are out-of-network with respect to BCBS-FL. In other words, Plaintiffs are not contracted with BCBS-FL to provide services to their insureds at a discounted rate.

49.     In short, Plaintiffs and their agents learned from the BCBS-FL representatives that each Former Patient had PPO coverage for substance abuse and mental health treatments and services, and that BCBS-FL was the relevant insurance company administrator, and/or contact for the Former Patient plans.

**D.     The Assignments to the Patients and the Coverage Owed Under the Horizon Policies.**

50.     Plaintiffs (or their agents, on Plaintiffs' behalf) obtained and obtain a valid assignment of benefits ("Assignment") from all patients before treating them.

51.     The Assignments give Plaintiffs the right to be paid directly for any services rendered to patients, and also entitle Plaintiffs to assert patients' legal rights to recover benefits. These legal rights include the right to file claims and appeals, to request and obtain information and documents relating to the plan, and to bring suit.

52.     The Assignments entitle Plaintiffs to collect payment for services provided to the Former Patients directly from BCBS-FL.

53.     The Assignments also confer legal standing on Plaintiffs to assert various legal claims against the Plans and BCBS-FL, including the claims asserted in this Complaint.

*Patient An.Wi:*

54.     Patient An.Wi. was covered under a BCBS-FL plan at the time services were provided by Shreya Health of California and Vedanta.

55.     Prior to providing services, Shreya Health of California required Patient An.Wi. to execute an assignment of benefits.

56.     The assignment from Patient An.Wi. to Shreya Health of California, provided that:

I patient/policyholder irrevocably assign, transfer, and convey to Provider the exclusive rights to benefits, insurance proceeds or other moneys otherwise due to me for services rendered by Providers ("Benefits") from my insurer, employee benefit plan, welfare benefit plan, government plan, tortfeasor or other liable third party ("Liable Third Parties") and all administrative, arbitral, judicial or other rights I may have relating to the recovery of Benefits from Liable Third Parties

57.    The assignment goes on to provide that:

I understand that the purpose of this Assignment of Benefits is to ensure that Provider is paid for services it has provided or will provide to me. Accordingly, I agree that any ambiguity regarding the scope of this Agreement shall be construed in favor of assigning Provider all rights that will assist in recovering Benefits from Liable Third Parties

I hereby authorize my insurance benefits to be paid to provider.

58.    Vedanta Labs also required Patient An.Wi. to execute an assignment of benefits, which provided that:

I irrevocably assign, transfer and convey to Vedanta the exclusive rights to benefits, insurance proceeds or other monies due to me for services rendered by Vedanta ("Benefits") from my insurer, employee benefit plan, welfare benefit plan, government plan, tortfeasor or other liable third part ("Liable Third Parties" and all administrative, arbitral, judicial or other rights I may have relating to the recovery of Benefits from Liable Third Parties.

59.    In addition to the assignment from Patient An.Wi., Plaintiffs also contacted BCBS-FL directly to get details of the type of coverage Patient An.Wi. had under his plan with BCBS-FL and the payments required to be made per the plan language.

60.    Specifically, plaintiffs confirmed for Patient An.Wi. the following relevant plan provisions and benefits, among others:

a.    The type of plan – was a self-funded PPO plan;

b.    The out of network deductible for substance abuse/mental health was $500;

c.  The policy covers, In-patient care, residential treatment, partial hospitalization, intensive outpatient care, and outpatient care for mental health/substance abuse;

d.  The policy pays 50% of benefits for out of network and 50% of labs;

e.  The plan covers Combined Alcohol and Substance Abuse, but not Combined Alcohol, Substance Abuse, and Mental Health;

f.  Precertification is needed for all levels of care except outpatient and there is a $500 precertification penalty if it is not obtained;

g.  No copay for any level of care;

h.  Code 90849 is valid and billable; and

i.  No out of state restrictions on the plan.

61.     Importantly, BCBS-FL never provided the actual plan documents to Plaintiffs or to Patient An.Wi., despite requests to do so, and therefore, the verification process had to be done over the phone.

62.     In all, for Patient An.Wi., there were $43,564.80 in billed charges and BCBS-FL paid a grand total of $1,237.83, which was paid directly to Patient An.Wi. virtually assuring that Plaintiffs would not get paid the amounts owed per the plan documents. In fact, Plaintiffs were not paid anything from the amounts paid to Patient An.Wi.

*Patient Ap.Br.:*

63.     Patient Ap.Br. was covered under a BCBS-FL plan at the time services were provided by Shreya Health of California.

64.     Prior to providing services, Shreya Health required Patient Ap.Br. to execute an assignment of benefits.

65.     The assignment from Patient Ap.Br. provided that:

I patient/policyholder irrevocably assign, transfer, and convey to Provider the exclusive rights to benefits, insurance proceeds or other moneys otherwise due to me for services rendered by Providers ("Benefits") from my insurer, employee benefit plan, welfare benefit plan, government plan, tortfeasor or other liable third party ("Liable Third Parties") and all administrative, arbitral, judicial or other rights I may have relating to the recovery of Benefits from Liable Third Parties

66.     The assignment went on to provide that:

I understand that the purpose of this Assignment of Benefits is to ensure that Provider is paid for services it has provided or will provide to me. Accordingly, I agree that any ambiguity regarding the scope of this Agreement shall be construed in favor of assigning Provider all rights that will assist in recovering Benefits from Liable Third Parties

I hereby authorize my insurance benefits to be paid to provider.

67.     In addition to the assignment from Patient Ap.Br., Plaintiffs also contacted BCBS-FL directly to get details of the type of coverage Patient Ap.Br. had under her plan with BCBS-FL and the payments required to be made per the plan language.

68.     Specifically, plaintiffs confirmed for Patient Ap.Br. the following relevant plan provisions and benefits, among others:

    a.  The type of plan – was a self-funded PPO plan;

    b.  The out of network deductible for substance abuse/mental health was $12,100;

    c.  The plan covers Combined Alcohol and Substance Abuse, but not Combined Alcohol, Substance Abuse and Mental Health;

    d.  The policy covers, In-patient care, residential treatment, partial hospitalization, intensive outpatient care, and outpatient care for substance abuse;

15

e. There is no annual maximum benefits under the plan;

f. There are no copays on the plan

g. The policy pays 100% of benefits for out of network after satisfaction of the deductible, and 50% of labs;

h. There is a $500 precertification penalty if it is not obtained;

i. All H codes are valid and billable, including S9480 and 90849; and

j. No out of state restrictions on the plan

69. Importantly, BCBS-FL never provided the actual plan documents to Plaintiffs or to Patient Ap.Br., despite requests to do so, and therefore the verification had to be done over the phone.

70. In all, for Patient Ap.Br., there were $2,200 in billed charges of which BCBS-FL paid $615.01 directly to Patient Ap.Br. virtually assuring that Plaintiffs would not get paid the amounts owed per the plan documents. In fact, Plaintiffs were not paid anything from the amount paid to Patient Ap.Br.

*Patient Co.Cl:*

71. Patient Co.Cl. was covered under a BCBS-FL plan at the time services were provided by Shreya Health of California.

72. Prior to providing services, Shreya Health required Patient Co.Cl. to execute an assignment of benefits.

73. The assignment from Patient Co.Cl. to Shreya Health provided that:

I patient/policyholder irrevocably assign, transfer, and convey to Provider the exclusive rights to benefits, insurance proceeds or other moneys otherwise due to me for services rendered by Providers ("Benefits") from my insurer, employee benefit plan, welfare benefit plan, government plan, tortfeasor or other liable third

16

party ("Liable Third Parties") and all administrative, arbitral, judicial or other rights I may have relating to the recovery of Benefits from Liable Third Parties.

74.     The assignment goes on to provide that:

I understand that the purpose of this Assignment of Benefits is to ensure that Provider is paid for services it has provided or will provide to me. Accordingly, I agree that any ambiguity regarding the scope of this Agreement shall be construed in favor of assigning Provider all rights that will assist in recovering Benefits from Liable Third Parties.

75.     In addition to the assignment from Patient Co.Cl., Plaintiffs also contacted BCBS-FL directly to get details of the type of coverage Patient Co.Cl. had under her plan with BCBS-FL and the payments required to be made per the plan language.

76.     Specifically, plaintiffs confirmed for Patient Co.Cl. the following relevant plan provisions and benefits:

a.   The type of plan – was a self-funded PPO plan;

b.   The out of network deductible for substance abuse/mental health was $500;

c.   The policy covers, In-patient care, residential treatment, partial hospitalization, intensive outpatient care, and outpatient care for mental health/substance abuse;

d.   The policy covers both Combined Alcohol and Substance Abuse and Combined Alcohol, Substance Abuse, and Mental Health;

e.   There is no annual maximum benefits under the plan;

f.   The policy pays 50% of benefits for out of network and 50% of labs;

g.   All S codes are eligible, including 80305, 90837, and 82075.

h.   Precertification is needed for all levels of care, except routine outpatient care. Claims will be denied if preauthorization is not obtained;

17

i. No out of state restrictions on the plan.

77. Importantly, BCBS-FL never provided the actual plan documents to Plaintiffs or to Patient Co.Cl., despite requests to do so, and therefore the verification had to be done over the phone.

78. In all, for Patient Co.Cl., there were $1,965 in billed charges and BCBS-FL only paid $170.13, which was paid directly to Patient Co.Cl., virtually assuring that Plaintiffs would not get paid the amounts owed per the plan documents. In fact, Plaintiffs were not paid anything by Patient Co.Cl. from the amounts paid by BCBS-FL.

*Patient Da.Cu.:*

79. Patient Da.Cu. was covered under a BCBS-FL plan at the time services were provided by Medical Concierge/Medlink.

80. Prior to providing services, Medlink required Patient Da.Cu. to execute an assignment of benefits.

81. The assignment from Patient Da.Cu. to Medlink provided that:

I patient/policyholder irrevocably assign, transfer, and convey to Provider the exclusive rights to benefits, insurance proceeds or other moneys otherwise due to me for services rendered by Providers ("Benefits") from my insurer, employee benefit plan, welfare benefit plan, government plan, tortfeasor or other liable third party ("Liable Third Parties") and all administrative, arbitral, judicial or other rights I may have relating to the recovery of Benefits from Liable Third Parties.

82. The assignment goes on to provide that:

I understand that the purpose of this Assignment of Benefits is to ensure that Provider is paid for services it has provided or will provide to me. Accordingly, I agree that any ambiguity regarding the scope of this Agreement shall be construed in favor of assigning Provider all rights that will assist in recovering Benefits from Liable Third Parties.

83.     In addition to the assignment from Patient Da.Cu., Plaintiffs also contacted BCBS-FL directly to get details of the type of coverage Patient Da.Cu. had under his plan with BCBS-FL and the payments required to be made per the plan language.

84.     Specifically, plaintiffs confirmed for Patient Da.Cu. the following relevant plan provisions and benefits:

a.   The type of plan – was a self-funded PPO plan;

b.   The out of network deductible for substance abuse/mental health was $0.00 with a maximum out of pocket of $14,000;

c.   The policy covers, In-patient care, residential treatment, partial hospitalization, intensive outpatient care, and outpatient care for mental health/substance abuse;

d.   There is no annual maximum benefits under the plan;

e.   The policy pays 50% of benefits for out of network and 50% of labs;

f.   The plan does no cover combined Alcohol and Substance Abuse and Combined Alcohol, Substance Abuse, and Mental Health.

g.   Precertification is needed for all levels of care except outpatient and if precertification is not obtained the claim may be denied; and

h.   No out of state restrictions on the plan.

85.     Importantly, BCBS-FL never provided the actual plan documents to Plaintiffs or to Patient Da.Cu., despite requests to do so, and therefore the verification had to be done over the phone.

86.     In all, for Patient Da.Cu., there were $26,520 in billed charges and BCBS-FL paid $5,619.81, which was paid directly to the patient virtually assuring that Plaintiffs would not get

paid the amounts owed per the plan documents. In fact, Plaintiffs were not paid anything from the amounts paid to Patient Da.Cu.

*Patient Ga.Ro.:*

87.     Patient Ga.Ro. was covered under a BCBS-FL plan at the time services were provided by Shreya Health of California.

88.     Prior to providing services, Shreya Health of California required Patient Ga.Ro. to execute an assignment of benefits.

89.     The assignment from Patient Ga.Ro. to Shreya Health of California provided that:

I patient/policyholder irrevocably assign, transfer, and convey to Provider the exclusive rights to benefits, insurance proceeds or other moneys otherwise due to me for services rendered by Providers ("Benefits") from my insurer, employee benefit plan, welfare benefit plan, government plan, tortfeasor or other liable third party ("Liable Third Parties") and all administrative, arbitral, judicial or other rights I may have relating to the recovery of Benefits from Liable Third Parties.

90.     The assignment goes on to provide that:

I understand that the purpose of this Assignment of Benefits is to ensure that Provider is paid for services it has provided or will provide to me. Accordingly, I agree that any ambiguity regarding the scope of this Agreement shall be construed in favor of assigning Provider all rights that will assist in recovering Benefits from Liable Third Parties.

91.     In addition to the assignment from Patient Ga.Ro., Plaintiffs also contacted BCBS-FL directly to get details of the type of coverage Patient Ga.Ro. had under his plan with BCBS-FL and the payments required to be made per the plan language.

92.     Specifically, plaintiffs confirmed for Patient Ga.Ro. the following relevant plan provisions and benefits:

     a.   The type of plan – was a self-funded PPO plan;

b.  The out of network deductible for substance abuse/mental health was $10,000;

c.  The policy covers, In-patient care, residential treatment, partial hospitalization, intensive outpatient care, and outpatient care for mental health/substance abuse and it is based on medical necessity;

d.  There is no annual maximum benefits under the plan;

e.  The policy pays 50% of benefits for out of network and 50% of labs;

f.  Benefits and labs are based on medical necessity

g.  Code US 80305 is covered.

h.  All HCPC codes are valid and billable, bur precertification is required.

i.  The plan does not cover combined Alcohol and Substance Abuse and Combined Alcohol, Substance Abuse, and Mental Health.

j.  Precertification is needed for all levels of care except outpatient and there is a penalty if preauthorization is not obtained;

k.  There is no copay for any level of care.

l.  Visit limit usage is based on medical necessity.

m.  No out of state restrictions on the plan

93.    Importantly, BCBS-FL never provided the actual plan documents to Plaintiffs or to Patient Ga.Ro., despite requests to do so, and therefore the verification had to be done over the phone.

94.    In all, for Patient Ga.Ro., there were $9,745 in billed charges and BCBS-FL paid $620.88, which was paid directly to the Patient Ga.Ro. virtually assuring that Plaintiffs would not

get paid the amounts owed per the plan documents. In fact, Plaintiffs were not paid any of the amounts received by Patient Ga.Ro.

*Patient Ha.La.:*

95.     Patient Ha.La. was covered under a Horizon policy at the time services were provided by Vedanta.

96.     Prior to providing services, Vedanta required Patient Ha.La. to execute an assignment of benefits.

97.     The assignment from Patient Ha.La. to Vedanta provided that:

I irrevocably assign, transfer and convey to Vedanta the exclusive rights to benefits, insurance proceeds or other monies due to me for services rendered by Vedanta ("Benefits") from my insurer, employee benefit plan, welfare benefit plan, government plan, tortfeasor or other liable third part ("Liable Third Parties" and all administrative, arbitral, judicial or other rights I may have relating to the recovery of Benefits from Liable Third Parties.

98.     In addition to the assignment from Patient Ha.La., Plaintiffs also contacted BCBS-FL directly to get details of the type of coverage Patient Ha.La. had under her plan with BCBS-FL and the payments required to be made per the plan language.

99.     Specifically, plaintiffs confirmed for Patient Ha.La. the following relevant plan provisions and benefits:

a.  The type of plan – was a self-funded PPO plan;

b.  The out of network deductible for substance abuse/mental health was $1,000 with a maximum out of pocket of $6,000;

c.  The policy covers, In-patient care, residential treatment, partial hospitalization, intensive outpatient care, and outpatient care for mental health/substance abuse;

d.   There is no annual maximum benefits under the plan;

e.   The policy pays 50% of benefits for out of network and 50% of labs;

f.   All HCPC codes are valid.

g.   The plan does cover combined Alcohol and Substance Abuse but not Combined Alcohol, Substance Abuse, and Mental Health.

h.   Visits are based on medical necessity

i.   Precertification is needed on all levels of care but outpatient;

j.   No out of state restrictions on the plan.

100.   Importantly, BCBS-FL never provided the actual plan documents to Plaintiffs or to Patient Ha.La., despite requests to do so, and therefore the verification had to be done over the phone.

101.   In all, for Patient Ha.La., there were $26,331 in billed charges of which BCBS-FL paid $887.34 directly to the patient. Of that amount, Plaintiffs were able to recover $731.46 from Patient Ha.La.

*Patient Je.Lo.:*

102.   Patient Je.Lo. was covered under a BCBS-FL plan at the time services were provided by Shreya Health of California and Vedanta.

103.   The assignment from Patient Je.Lo. to Shreya, provided that:

I patient/policyholder irrevocably assign, transfer, and convey to Provider the exclusive rights to benefits, insurance proceeds or other moneys otherwise due to me for services rendered by Providers ("Benefits") from my insurer, employee benefit plan, welfare benefit plan, government plan, tortfeasor or other liable third party ("Liable Third Parties") and all administrative, arbitral, judicial or other rights I may have relating to the recovery of Benefits from Liable Third Parties.

104.   The assignment went on to state:

I understand that the purpose of this Assignment of Benefits is to ensure that Provider is paid for services it has provided or will provide to me. Accordingly, I agree that any ambiguity regarding the scope of this Agreement shall be construed in favor of assigning Provider all rights that will assist in recovering Benefits from Liable Third Parties.

105.    In addition to the assignment to Shreya, Plaintiffs also received an assignment from Patient Je.Lo. for the services provided by Vedanta.

106.    The assignment from Patient Je.Lo. to Vedanta provided that:

I irrevocably assign, transfer and convey to Vedanta the exclusive rights to benefits, insurance proceeds or other monies due to me for services rendered by Vedanta ("Benefits") from my insurer, employee benefit plan, welfare benefit plan, government plan, tortfeasor or other liable third part ("Liable Third Parties" and all administrative, arbitral, judicial or other rights I may have relating to the recovery of Benefits from Liable Third Parties

107.    In addition to the assignments noted above, Plaintiffs also contacted BCBS-FL directly to get details of the type of coverage Patient Je.Lo. had under her plan with BCBS-FL and the payments required to be made per the plan language.

108.    Specifically, plaintiffs confirmed for Patient Je.Lo. the following relevant plan provisions and benefits, among others:

a.   The type of plan – was a self-funded PPO plan;

b.   The out of network deductible for substance abuse/mental health was $12,200 with a maximum out of pocket of $12,500;

c.   The policy covers, In-patient care, residential treatment, partial hospitalization, intensive outpatient care, and outpatient care for mental health/substance abuse;

d.   There is no annual maximum benefits under the plan;

e.   The policy pays 50% of benefits for out of network and 50% of labs;

f.   Precertification is required for all levels of care except outpatient.

24

g.  Out of state benefits are covered.

h.  The plan covers combined Alcohol and Substance Abuse but not Combined Alcohol, Substance Abuse, and Mental Health.

i.  Precertification is needed for all levels of care except outpatient and there is a penalty if preauthorization is not obtained;

j.  No copay for any level of care.

109.  Importantly, BCBS-FL never provided the actual plan documents to Plaintiffs or to Patient Je.Lo., despite requests to do so, and therefore the verification had to be done over the phone.

110.  In all, for Patient Je.Lo. there were $11,291.65 in billed charges of which BCBS-FL paid $754.43 which was paid directly to the Patient Je.Lo. virtually assuring that Plaintiffs would not get paid the amounts owed per the plan documents. In fact, Plaintiffs were not paid any of the amounts received by Patient Je.Lo.

*Patient Kr.Ja.:*

111.  Patient Kr.Ja. was covered under a BCBS-FL plan at the time services were provided by Satya Health of California and Shreya Health of California.

112.  The assignment from Patient Kr.Ja. to Satya and Shreya provided that:

I patient/policyholder irrevocably assign, transfer, and convey to Provider the exclusive rights to benefits, insurance proceeds or other moneys otherwise due to me for services rendered by Providers ("Benefits") from my insurer, employee benefit plan, welfare benefit plan, government plan, tortfeasor or other liable third party ("Liable Third Parties") and all administrative, arbitral, judicial or other rights I may have relating to the recovery of Benefits from Liable Third Parties.

113.  The assignment went on to provide that:

I understand that the purpose of this Assignment of Benefits is to ensure that Provider is paid for services it has provided or will provide to me. Accordingly, I

25

agree that any ambiguity regarding the scope of this Agreement shall be construed in favor of assigning Provider all rights that will assist in recovering Benefits from Liable Third Parties.

114.     In addition to the assignments from Patient Kr.Ja., Plaintiffs also contacted BCBS-FL directly to get details of the type of coverage Patient Kr.Ja. had under his plan with BCBS-FL and the payments required to be made per the plan language.

115.     Specifically, plaintiffs confirmed for Patient Kr.Ja. the following relevant plan provisions and benefits:

   a.   The type of plan – was a self-funded PPO plan;

   b.   The out of network deductible for substance abuse/mental health was $12,200 with a maximum out of pocket of $12,500;

   c.   The policy covers, In-patient care, residential treatment, partial hospitalization, intensive outpatient care, and outpatient care for mental health/substance abuse;

   d.   There is no annual maximum benefits under the plan;

   e.   The policy pays 50% of benefits for out of network and 50% of labs;

   f.   Benefits are based on medical necessity.

   g.   The plan covers combined Alcohol and Substance Abuse but not Combined Alcohol, Substance Abuse, and Mental Health.

   h.   Precertification is needed for all levels of care except outpatient.

   i.   No out of state restrictions on the plan.

116.     Importantly, BCBS-FL never provided the actual plan documents to Plaintiffs or to Patient Kr.Ja., despite requests to do so, and therefore the verification had to be done over the phone.

26

117.    In all, for Patient Kr.Ja. there was $85,105 in billed charges of which BCBS-FL paid $32,033.67 which was paid directly to the Patient Kr.Ja. virtually assuring that Plaintiffs would not get paid the amounts owed per the plan documents. In fact, Plaintiffs were not paid any of the amounts received by Patient Kr.Ja.

*Patient Li.Bu.:*

118.    Patient Li.Bu. was covered under a BCBS-FL plan at the time services were provided by Sovereign Health of Phoenix, Shreya, and Vedanta.

119.    Sovereign Health of Phoenix and Shreya required Patient Li.Bu. to execute an assignment of benefits, which provided that:

I patient/policyholder irrevocably assign, transfer, and convey to Provider the exclusive rights to benefits, insurance proceeds or other moneys otherwise due to me for services rendered by Providers ("Benefits") from my insurer, employee benefit plan, welfare benefit plan, government plan, tortfeasor or other liable third party ("Liable Third Parties") and all administrative, arbitral, judicial or other rights I may have relating to the recovery of Benefits from Liable Third Parties.

120.    The assignment goes on to provide that:

I understand that the purpose of this Assignment of Benefits is to ensure that Provider is paid for services it has provided or will provide to me. Accordingly, I agree that any ambiguity regarding the scope of this Agreement shall be construed in favor of assigning Provider all rights that will assist in recovering Benefits from Liable Third Parties.

121.    In addition to the assignment to Sovereign Phoenix and Shreya, Plaintiffs also received an assignment from Patient Li.Bu. to Vedanta.

122.    The assignment from Patient Li.Bu. to Vedanta provided that:

I irrevocably assign, transfer and convey to Vedanta the exclusive rights to benefits, insurance proceeds or other monies due to me for services rendered by Vedanta ("Benefits") from my insurer, employee benefit plan, welfare benefit plan, government plan, tortfeasor or other liable third part ("Liable Third Parties" and all administrative, arbitral, judicial or other rights I may have relating to the recovery of Benefits from Liable Third Parties.

123.    Plaintiffs also contacted BCBS-FL directly to get details of the type of coverage Patient Li.Bu. had under her plan with BCBS-FL and the payments required to be made per the plan language.

124.    Specifically, plaintiffs confirmed for Patient Li.Bu. the following relevant plan provisions and benefits:

a.  The type of plan – was a self-funded PPO plan;

b.  The out of network deductible for substance abuse/mental health was $500;

c.  The policy covers, In-patient care, residential treatment, partial hospitalization, intensive outpatient care, and outpatient care for mental health/substance abuse;

d.  There is no annual maximum benefits under the plan;

e.  The policy pays 50% of benefits for out of network and 50% of labs;

f.  Benefits are based on medical necessity.

g.  The plan does not cover combined Alcohol and Substance Abuse and Combined Alcohol, Substance Abuse, and Mental Health.

h.  Precertification is needed for all levels of care except outpatient and there is a penalty if preauthorization is not obtained;

i.  Visits are limited based on medical necessity.

j.  No out of state restrictions on the plan.

125.    Importantly, BCBS-FL never provided the actual plan documents to Plaintiffs or to Patient Li.Bu., despite requests to do so, and therefore the verification had to be done over the phone.

126.     In all, for Patient Li.Bu. there were $99,890 in billed charges of which BCBS-FL paid $3,112.28 to Patient Ha.Ke and Plaintiffs were able to recover from Patient Li.Bu. $464.84, significantly less that what was owed under the plan documents.

*Patient Ni.Ca.:*

127.     Patient Ni.Ca. was covered under a BCBS-FL plan at the time services were provided by Shreya Health of California.

128.     Prior to providing services, Shreya Health of California required Patient Ni.Ca. to execute an assignment of benefits.

129.     The assignment from Patient Ni.Ca. to Shreya Health of California provided that:

I patient/policyholder irrevocably assign, transfer, and convey to Provider the exclusive rights to benefits, insurance proceeds or other moneys otherwise due to me for services rendered by Providers ("Benefits") from my insurer, employee benefit plan, welfare benefit plan, government plan, tortfeasor or other liable third party ("Liable Third Parties") and all administrative, arbitral, judicial or other rights I may have relating to the recovery of Benefits from Liable Third Parties.

130.     The assignment goes on to provide that:

I understand that the purpose of this Assignment of Benefits is to ensure that Provider is paid for services it has provided or will provide to me. Accordingly, I agree that any ambiguity regarding the scope of this Agreement shall be construed in favor of assigning Provider all rights that will assist in recovering Benefits from Liable Third Parties.

131.     In addition to the assignment from Patient Ni.Ca., Plaintiffs also contacted BCBS-FL directly to get details of the type of coverage Patient Ni.Ca. had under her plan with Horizon and the payments required to be made per the plan language.

132.     Specifically, plaintiffs confirmed for Patient Ni.Ca. the following relevant plan provisions and benefits:

a.   The type of plan – was a self-funded PPO plan;

b.  The out of network deductible for substance abuse/mental health was $12,200 with a maximum out of pocket of $12,500;

c.  The policy covers, In-patient care, residential treatment, partial hospitalization, intensive outpatient care, and outpatient care for mental health/substance abuse;

d.  There is no annual maximum benefits under the plan;

e.  The policy pays 50% of benefits for out of network and 50% of labs;

f.  Benefits are based on medical necessity.

g.  The plan covers combined Alcohol and Substance Abuse but not Combined Alcohol, Substance Abuse, and Mental Health.

h.  Precertification is needed for all levels of care if there is no precertification, there is a $500 penalty;

i.  There is no copay for any level of care.

j.  No out of state restrictions on the plan.

133.    Importantly, BCBS-FL never provided the actual plan documents to Plaintiffs or to Patient Ni.Ca., despite requests to do so, and therefore the verification had to be done over the phone.

134.    In all, for Patient Ni.Ca. there were $9,930 in billed charges and BCBS-FL only paid $1,110.93 directly to Patient Ni.Ca. virtually assuring that Plaintiffs would not get paid.  In fact, Plaintiffs were not paid any of the amounts received by Patient Ni.Ca.

*Patient No.Bl.:*

135.    Patient No.Bl. was covered under a BCBS-FL plan at the time services were provided by Shreya Health of California.

136. Prior to providing services, Shreya Health of California required Patient No.Bl. to execute an assignment of benefits.

137. The assignment from Patient No.Bl. to Shreya Health of California provided that:

I patient/policyholder irrevocably assign, transfer, and convey to Provider the exclusive rights to benefits, insurance proceeds or other moneys otherwise due to me for services rendered by Providers ("Benefits") from my insurer, employee benefit plan, welfare benefit plan, government plan, tortfeasor or other liable third party ("Liable Third Parties") and all administrative, arbitral, judicial or other rights I may have relating to the recovery of Benefits from Liable Third Parties.

138. The assignment goes on to provide that:

I understand that the purpose of this Assignment of Benefits is to ensure that Provider is paid for services it has provided or will provide to me. Accordingly, I agree that any ambiguity regarding the scope of this Agreement shall be construed in favor of assigning Provider all rights that will assist in recovering Benefits from Liable Third Parties.

139. In addition to the assignment from Patient No.Bl., Plaintiffs also contacted BCBS-FL directly to get details of the type of coverage Patient No.Bl. had under his plan with BCBS-FL and the payments required to be made per the plan language.

140. Specifically, plaintiffs confirmed for Patient No.Bl. the following relevant plan provisions and benefits, among others:

a. The type of plan – was a self-funded PPO plan;

b. The out of network deductible for substance abuse/mental health was $12,200 with a maximum out of pocket of $12,500;

c. The policy covers, In-patient care, residential treatment, partial hospitalization, intensive outpatient care, and outpatient care for mental health/substance abuse;

d. There is no annual maximum benefits under the plan;

e.   The policy pays 50% of benefits for out of network and 50% of labs;

f.   Visits are based on medical necessity.

g.   No copay for any levels of care.

h.   The plan covers combined Alcohol and Substance Abuse but not Combined Alcohol, Substance Abuse, and Mental Health.

i.   Precertification is needed for all levels of care. If precertification is not obtained, there is a $500 penalty and/or the claim may be denied;

j.   No out of state restrictions on the plan.

141.   Importantly, BCBS-FL never provided the actual plan documents to Plaintiffs or to Patient No.Bl., despite requests to do so, and therefore the verification had to be done over the phone

142.   In all, for Patient No.Bl. there were $14,855.00 in billed charges of which BCBS-FL paid a total of $1,873.27 to the patient, virtually assuring that Plaintiffs would not get paid the amounts due per the Plan documents.  In fact, Plaintiffs were not paid any of the amounts received by Patient No.Bl.

*Patient Ri.Di.:*

143.   Patient Ri.Di. was covered under a BCBS-FL plan at the time services were provided by Shreya Health of California.

144.   Prior to providing services, Shreya Health of California required Patient Ri.Di. to execute an assignment of benefits.

145.   The assignment from Patient Ri.Di. to Shreya Health of California provided that:

I patient/policyholder irrevocably assign, transfer, and convey to Provider the exclusive rights to benefits, insurance proceeds or other moneys otherwise due to me for services rendered by Providers ("Benefits") from my insurer, employee

benefit plan, welfare benefit plan, government plan, tortfeasor or other liable third party ("Liable Third Parties") and all administrative, arbitral, judicial or other rights I may have relating to the recovery of Benefits from Liable Third Parties.

146.    The assignment goes on to provide that:

I understand that the purpose of this Assignment of Benefits is to ensure that Provider is paid for services it has provided or will provide to me. Accordingly, I agree that any ambiguity regarding the scope of this Agreement shall be construed in favor of assigning Provider all rights that will assist in recovering Benefits from Liable Third Parties.

147.    In addition to the assignment from Patient Ri.Di., Plaintiffs also contacted BCBS-FL directly to get details of the type of coverage Patient Ri.Di. had under his plan with BCBS-FL and the payments required to be made per the plan language.

148.    Specifically, plaintiffs confirmed for Patient Ri.Di. the following relevant plan provisions and benefits, among others:

   a.   The type of plan – was a self-funded PPO plan;

   b.   The out of network deductible for substance abuse/mental health was $12,200 with a maximum out of pocket at $12,500.

   c.   The policy covers, In-patient care, residential treatment, partial hospitalization, intensive outpatient care, and outpatient care for mental health/substance abuse;

   d.   There is no annual maximum benefits under the plan;

   e.   The policy pays 100% of benefits for out of network Inpatient levels of care; however for outpatient the overage is 50% and 50% of labs is covered;

   f.   Visits are based on medical necessity.

   g.   The plan covers combined Alcohol and Substance Abuse but not Combined Alcohol, Substance Abuse, and Mental Health.

h.  Precertification is needed for all levels of care except outpatient. If precertification is not obtained, the claim will be denied – no penalty.

i.  No out of state restrictions on the plan

149.  Importantly, BCBS-FL never provided the actual plan documents to Plaintiffs or to Patient Ri.Di., despite requests to do so, and therefore the verification had to be done over the phone

150.  In all, for Patient Ri.Di. there were $4,605.00 in billed charges of which BCBS-FL paid a total of $544.93 to the patient, virtually assuring that Plaintiffs would not get paid the amounts due per the Plan documents.  In fact, Plaintiffs were not paid any of the amounts received by Patient Ri.Di.

*Patient St.Li.:*

151.  Patient St.Li. was covered under a BCBS-FL plan at the time services were provided by Sovereign Health of California.

152.  Prior to providing services, Sovereign Health of California required Patient St.Li. to execute an assignment of benefits.

153.  The assignment from Patient St.Li.to Sovereign Health of California provided that:

I patient/policyholder irrevocably assign, transfer, and convey to Provider the exclusive rights to benefits, insurance proceeds or other moneys otherwise due to me for services rendered by Providers ("Benefits") from my insurer, employee benefit plan, welfare benefit plan, government plan, tortfeasor or other liable third party ("Liable Third Parties") and all administrative, arbitral, judicial or other rights I may have relating to the recovery of Benefits from Liable Third Parties.

154.  The assignment goes on to provide that:

I understand that the purpose of this Assignment of Benefits is to ensure that Provider is paid for services it has provided or will provide to me. Accordingly, I agree that any ambiguity regarding the scope of this Agreement shall be construed

in favor of assigning Provider all rights that will assist in recovering Benefits from Liable Third Parties.

155.    In addition to the assignment from Patient St.Li., Plaintiffs also contacted BCBS-FL directly to get details of the type of coverage Patient St.Li. had under his plan with BCBS-FL and the payments required to be made per the plan language.

156.    Specifically, plaintiffs confirmed for Patient St.Li. the following relevant plan provisions and benefits, among others:

   a.   The type of plan – was a self-funded PPO plan;

   b.   The out of network deductible for substance abuse/mental health was $10,000 with a maximum out of pocket of $12,800;

   c.   The policy covers, In-patient care, residential treatment, partial hospitalization, intensive outpatient care, and outpatient care for mental health/substance abuse;

   d.   There is no annual maximum benefits under the plan;

   e.   The policy pays 50% of benefits for out of network and 50% of labs;

   f.   There are no copays for any level of care.

   g.   The plan covers combined Alcohol and Substance Abuse but not Combined Alcohol, Substance Abuse, and Mental Health.

   h.   Precertification is needed for all levels of care except outpatient.

   i.   No out of state restrictions on the plan

157.    Importantly, BCBS-FL never provided the actual plan documents to Plaintiffs or to Patient St.Li., despite requests to do so, and therefore the verification had to be done over the phone

158.    In all, for Patient St.Li. there were $36,325.00 in billed charges of which BCBS-FL paid a total of $13,299.11 to the patient, virtually assuring that Plaintiffs would not get paid the amounts due per the Plan documents.  In fact, Plaintiffs were not paid any of the amounts received by Patient St.Li.

*Patient Xi.Ma..:*

159.    Patient Xi.Ma. was covered under a BCBS-FL plan at the time services were provided by Shreya Health of California, Medlink, and Vedanta.

160.    Prior to providing services, Shreya Health of California and Medlink required Patient Xi.Ma. to execute an assignment of benefits.

161.    The assignment from Patient Xi.Ma. to Shreya Health of California provided that:

I patient/policyholder irrevocably assign, transfer, and convey to Provider the exclusive rights to benefits, insurance proceeds or other moneys otherwise due to me for services rendered by Providers ("Benefits") from my insurer, employee benefit plan, welfare benefit plan, government plan, tortfeasor or other liable third party ("Liable Third Parties") and all administrative, arbitral, judicial or other rights I may have relating to the recovery of Benefits from Liable Third Parties.

162.    The assignment goes on to provide that:

I understand that the purpose of this Assignment of Benefits is to ensure that Provider is paid for services it has provided or will provide to me. Accordingly, I agree that any ambiguity regarding the scope of this Agreement shall be construed in favor of assigning Provider all rights that will assist in recovering Benefits from Liable Third Parties.

163.    In addition to the assignment from Patient Xi.Ma. to Medlink and Shreya, Plaintiffs also received an assignment to Vedanta.

164.    The assignment from Patient Xi.Ma. to Vedanta provided that:

I irrevocably assign, transfer and convey to Vedanta the exclusive rights to benefits, insurance proceeds or other monies due to me for services rendered by Vedanta ("Benefits") from my insurer, employee benefit plan, welfare benefit plan, government plan, tortfeasor or other liable third part ("Liable Third Parties" and all

administrative, arbitral, judicial or other rights I may have relating to the recovery of Benefits from Liable Third Parties.

165.    Plaintiffs also contacted BCBS-FL directly to get details of the type of coverage Patient Xi.Ma. had under his plan with BCBS-FL and the payments required to be made per the plan language.

166.    Specifically, plaintiffs confirmed for Patient Xi.Ma. the following relevant plan provisions and benefits, among others:

    a.    The type of plan – was a self-funded PPO plan;

    b.    The out of network deductible for substance abuse/mental health was $12,200 with a maximum out of pocket of $12,500;

    c.    The policy covers, In-patient care, residential treatment, partial hospitalization, intensive outpatient care, and outpatient care for mental health/substance abuse;

    d.    There is no annual maximum benefits under the plan;

    e.    The policy pays 50% of benefits for out of network and 50% of labs;

    f.    There are no copays for any level of care.

    g.    The plan covers combined Alcohol and Substance Abuse but not Combined Alcohol, Substance Abuse, and Mental Health.

    h.    Precertification is needed for all levels of care except outpatient. If precertification is not obtained, the claim for services is denied.

    i.    No out of state restrictions on the plan

167.     Importantly, BCBS-FL never provided the actual plan documents to Plaintiffs or to Patient Xi.Ma., despite requests to do so, and therefore the verification had to be done over the phone.

168.     In all, for Patient Xi.Ma. there were $29,025 in billed charges of which BCBS-FL paid a total of $8,872.11 to the patient, virtually assuring that Plaintiffs would not get paid the amounts due per the Plan documents.  In fact, Plaintiffs only recovered $236.72 from the amounts received by Patient Xi.Ma.

**E.     After Providing Covered Services, Plaintiffs Submitted Claims for Benefits to the Blue Cross Defendants Following Blue Cross Procedures.**

169.     Plaintiffs provided medically necessary services to the Former Patients that were covered by their plans.

170.     Plaintiffs then sought payment by submitting the appropriate documents to BCBS-FL. The claims for payment notified the BCBS-FL that Plaintiffs had obtained valid Assignments from the Former Patients and asserted Plaintiffs' right to receive any benefits owed to the Former Patients under the terms of their health plans.

171.     After the verification of benefits, Defendants (or their agents) repeatedly continued to interact with Plaintiffs (or their agents) with respect to the Former Patients and claims for whom Plaintiffs received assignments. In addition to verification of services, such interaction, which was over a long period of time, included receiving and processing UB-04 claim forms for payment for the services, communicating with Plaintiffs (or their agents) about the services and claims, and requesting additional documentation for the claims.

**F.     The Blue Cross Defendants Approved Plaintiffs Claims But Arbitrarily Disregarded Their Assignments and/or significantly underpaid claims.**

172.    During this continued interaction neither BCBS-FL nor their agents notified Plaintiffs or their agents that BCBS-FL would not honor any assignment of benefits.  Nor did BCBS-FL refuse to deal directly with Plaintiffs or their agents with respect to the claims of the Former Patients. Indeed, BCBS-FL (or their agents) regularly informed Plaintiffs' agents through express words in many cases, but at a minimum impliedly through their actions, that the claims of Former Patients at issue were freely assignable.

173.    A valid assignment obligates the debtor to pay the assignee, not the original creditor.

174.    When there is a valid assignment in place, performance under a contract runs to the assignee. Thus, when a creditor assigns its interest in an existing debt owed to it, the debtor must generally pay the debt to the assignee, not the original creditor. Indeed, after a debtor has received notice of a valid assignment, or obtained knowledge of it in any manner, assignor or any person other than the assignee is at the debtor's peril and does not to the assignee.

175.    Plaintiffs are informed and believe that BCBS-FL approved and authorized payment on Plaintiffs' claims for benefits in connection with the services provided to the Former Patients, but did not pay Plaintiffs (apparently on the grounds that Plaintiffs were assignees).

176.    In other words, despite BCBS-FL being informed of and provided with written notice that Plaintiffs were assignees— and despite BCBS-FL approving the underlying claim for covered services—BCBS either mailed checks directly to the Former Patients and not to Plaintiffs or failed to pay the claim entirely.

177.    Plaintiffs are informed and believe that the Blue Cross Defendants' disregard of Plaintiffs' Assignments is consistent with acknowledged BlueCard policy to disregard the assignments of out-of-network providers like Plaintiffs. As one Blue Cross Company put it:

"payments for services rendered by providers who do not contract with [Blue Cross] are sent directly to our customers. Thus, out-of-network providers face the inconvenience of attempting to collect payment from the customer and the accompanying possibility of incurring bad debts." See *Blue Perspective: BCBSOK Position on Legislation and Regulatory Issues,* Blue Cross Blue Shield Oklahoma, www.bcbsok.com/grassroots/pdf/blueperspective_aob27-103003.pdf (last visited 10/28/20)

178.     Indeed, when Plaintiffs sought payment for covered claims the Former Patients had assigned to it, Blue Cross uniformly refused to pay, or even to acknowledge, Plaintiffs' benefit claims. Neither Plaintiffs' initial UB-04 requests for payment nor its follow-up letters resulted in payment.

179.     In this litigation, BCBS-FL's policy of misleading Plaintiffs on the assignability of claims and/or disregarding assignments to out-of- network providers like Plaintiffs led them to send large sums of money to chemically dependent individuals. That practice was patently reckless with respect to the health and safety of the Former Patients, as well as the health and safety of the general public. It also all but guaranteed that Plaintiffs would receive only a fraction of what it was owed for their services.

180.     In addition to disregarding the assignments of various patients, BCBS-FL improperly paid only a fraction of the billed charges for the particular medical services at issue in this litigation.

181.     Even taking into account the amounts that BCBS-FL may contend are the patients' responsibility, the payments made by BCBS-FL are still woefully inadequate and well below what should have been paid per the confirmed plan coverage information – obtained prior to providing services to the various patients.

182.    In fact, there is more than $400,000 still due and owing from BCBS-FL.

183.    In violation of their duties under ERISA and Florida State law, BCBS-FL failed and refused to:  i) pay plaintiffs for the health care services provided to the patients who are covered by various Blue Cross plans; ii) failed and refused to provide full and fair review of the plaintiffs charges; and iii)failed and refused to provide a meaningful review process.

184.    Because of BCBS-FL's actions, Plaintiffs have been paid substantially less than they should have been for the services provided.

**FIRST CLAIM FOR RELIEF**
**CLAIM TO RECOVER BENEFITS UNDER ERISA AND FLORIDA STATE LAW**

185.    Plaintiffs repeat the allegations contained in paragraphs 1 through 53, 87 through 110, and 169 through 184 of this Complaint.

186.    As noted above, this litigation involves fourteen Former Patients who paid for Plaintiffs' services through health insurance provided by various plans; such plans and their benefits being governed by ERISA and/or Florida State law and require payment according to the Plan terms.

187.    The Former Patients who had health insurance provided by an employer-sponsored plan, covered by ERISA include the following: Ga.Ro., Ha.La., Je.Lo., and the following Former Patients have health insurance provided by an employer sponsored plan that is not covered by ERISA: An.Wi., Ap.Br., Co.Cl., Da.Cu., Kr.Ja., Li.Bu., Ni.Ca., No.Bl., Ri.Di., St.Li, Xi.Ma.

188.    ERISA is a landmark federal law enacted to promote the interests of employees and their beneficiaries in employee benefit plans and to protect contractually defined benefits owed to those employees and beneficiaries.

189.    To that end, ERISA imposes extensive procedural requirements on employee benefit plans. For example, it mandates that a written instrument be established and maintained, 29 U.S.C. § 1102; that a straightforward summary of material plan terms be furnished to participants and beneficiaries, *id.* § 1022; that a grievance and appeals process be established, *id.* § 1133; and that fiduciary duties be satisfied by those who manage the plan, *id.* § 1104.

190.    ERISA also gives plan participants and their beneficiaries the right to sue for benefits, 29 U.S.C. § 1132(a)(1)(B), to enforce or clarify their rights under the plan, ibid., to enjoin violations of ERISA or the terms of the plan, *id.* § 1132(a)(3)(A), and "to obtain other appropriate equitable relief . . . ," *id.* § 1132(a)(3)(B).

191.    Each of the plans covered the mental health and/or substance abuse treatment services provided by Plaintiffs to the Former Patients.

192.    BCBS-FL, who insured the various plans, had independent financial incentives to keep benefit costs low because they paid for covered health care services themselves.

193.    Plaintiffs are "beneficiaries" under ERISA with standing to assert the claims of their assignors. See *Misic v. Bldg. Servs. Emps. Health & Welfare Trust,* 789 F.2d 1374, 1379 (9th Cir. 1986).

194.    And any beneficiary—including an assignee—who makes a claim is a "claimant" under federal law. 29 C.F.R. § 2560.503-1(a) ("[T]his section sets forth minimum requirements for employee benefit plan procedures pertaining to claims for benefits by participants and beneficiaries (hereinafter referred to as claimants).")

195.    Plaintiffs formally asserted claims for ERISA benefits and for benefits to be paid in accordance with Florida State law by submitting UB-04s to the BCBS-FL for services provided to the Former Patients.

196.     Plaintiffs never received any response from BCBS-FL. As Plaintiffs learned only later and at great expense, BCBS-FL instead had approved and authorized payment on the claims for Plaintiffs' services to the Former Patients. BCBS-FL then issued payment checks to the Former Patients.

197.     When BCBS-FL sent claims payment checks to the Former Patients, Plaintiffs received no written notice that payment had been made. As a result, Plaintiffs did not know whether BCBS-FL had acted on their claims at all, what decisions they had reached if they had, or why they never received payment.

198.     Only recently, after a costly and protracted investigation, were Plaintiffs able to ascertain, based on the currently available information, the amounts that are owed with respect to some of the Former Patients.

199.     Plaintiffs were unable to challenge any of the payments made to the Former Patients because they were not given notice of the payments and were not given copies of the Explanation of Benefits. Even now, despite repeated requests, Plaintiffs do not have the operative plan documents for most if not all of the Former Patients.  In addition, for all of the Former Patients, BCBS-FL has not explained the method by which it calculated the amount paid, as required by 29 C.F.R. § 2560.503-1.

200.     Defendants have violated ERISA and Florida State laws and regulations and the terms on the applicable plans in the following ways:

a.   Failing to honor Plaintiffs' valid Assignments of Benefits and, instead, making payment directly to Former Patients;

b.   Failing to promptly notify Plaintiffs or Former Patients if additional information was needed to honor a valid Assignment of Benefits;

c. Failing to promptly notify Plaintiffs or Former Patients that a valid Assignment of Benefits would not be honored;

d. Failing to produce plan documents;

e. Failing to provide explanation of benefits;

f. Failing to properly interpret plan language so as to properly pay plan benefits; and

g. Failing to properly explain the calculation of the payment of benefits.

h. Paying substantially less than the amounts owed for the services provided to the patients.

201. As a result, Plaintiffs have been damaged in the following ways, among others:

a. Plaintiffs were not paid in accordance with valid Assignments of Benefits;

b. Plaintiffs had to recover payments from Former Patients, at their own expense;

c. Plaintiffs have been unable to recover all payments from all Former Patients;

d. Plaintiffs have been unable to participate in the administrative appeal process as they were not given proper notice;

e. Plaintiffs have been unable to ascertain whether payments to some Former Patients were proper, as they do not have plan documents, explanation of benefits, and/or explanations of the calculation of the payment of benefits; and

f. Plaintiffs, in pursuing this action, has been required to incur attorneys' costs and fees. Pursuant to 29 U.S.C. § 1132(g)(1), Plaintiffs are entitled to have such fees and costs paid by Defendants.

**WHEREFORE**, Plaintiffs demands relief under this First Count of the Complaint as follows:

a. For compensatory damages, including all amounts owed to date for the required and covered services to the Former Patients;

b. For attorneys' fees as permitted by law;

c. Interest and costs of suit;

d. Such other relief that the Court deems appropriate.

**SECOND CLAIM FOR RELIEF**
**BREACH OF CONTRACT**

202.   Plaintiffs repeat the allegations contained in paragraph 1 through 53, 54 through 86, 111 through 168, and 169 through 184 of this Complaint.

203.   As described above, BCBS-FL failed to pay for covered health benefits provided by plaintiffs or significantly underpaid the health benefits provided by plaintiffs.

204.   The failure of BCBS-FL to pay the required benefits under the various health plans covering the Former Patients including Ga.Ro., Ha.La., Je.Lo., An.Wi., Ap.Br., Co.Cl., Da.Cu., Kr.Ja., Li.Bu., Ni.Ca., No.Bl., Ri.Di., St.Li, and Xi.Ma .is a breach of the insurance contract as a result of which plaintiffs have been damaged.

205.   Specifically, BCBS-FL have violated Florida State laws and breached their insurance contract in the following ways:

a. Failing to honor Plaintiffs' valid Assignments of Benefits and, instead, making payment directly to Former Patients;

b. Failing to promptly notify Plaintiffs or Former Patients if additional information was needed to honor a valid Assignment of Benefits;

c. Failing to promptly notify Plaintiffs or Former Patients that a valid Assignment of Benefits would not be honored;

    d.   Failing to produce plan documents;

    e.   Failing to provide explanation of benefits;

    f.   Failing to properly interpret plan language so as to properly pay plan benefits; and

    g.   Failing to properly explain the calculation of the payment of benefits.

    h.   Paying substantially less than the amounts owed for the services provided to the patients.

206.   As a result, Plaintiffs have been damaged in the following ways, among others:

    a.   Plaintiffs were not paid in accordance with valid Assignments of Benefits;

    b.   Plaintiffs had to recover payments from Former Patients, at their own expense;

    c.   Plaintiffs have been unable to recover all payments from all Former Patients;

    d.   Plaintiffs have been unable to participate in the administrative appeal process as they were not given proper notice;

    e.   Plaintiffs have been unable to ascertain whether payments to some Former Patients were proper, as they do not have plan documents, explanation of benefits, and/or explanations of the calculation of the payment of benefits; and

    f.   Plaintiffs, in pursuing this action, has been required to incur attorneys' costs and fees.

**WHEREFORE**, Plaintiffs demands relief under this Second Count of the Complaint as follows:

    a.   For compensatory damages, including all amounts owed to date for the required and covered services to the Former Patients;

    b.   For attorneys' fees as permitted by law;

    c.   Interest and costs of suit;

d.   Such other relief that the Court deems appropriate

Dated:  March 30, 2022

*/s/ Edward P. Dabdoub*
Edward Philip Dabdoub (FBN. 45685)
eddie@longtermdisability.net
DABDOUB LAW FIRM, P.A.
1600 Ponce de Leon Blvd., Suite 1202
Coral Gables, Florida 33134
Tel: (305) 754-2000
Fax: (305) 754-2007
*Attorneys for Plaintiffs*